# In re Investigation of November 15, 1990 Rate Design Filing of Vermont Power Exchange

[617 A.2d 418]

No. 91-234

Present: **Allen, C.J., Gibson, Dooley and Morse, JJ., and Peck, J. (Ret.), Specially Assigned**

Opinion Filed September 4, 1992

*Donald L. Rushford*, General Counsel, and *Kimberly K. Hayden* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Appellant.

*Michael Marks* of *Lisman & Lisman*, Burlington, for Appellee Vermont Power Exchange.

*George E. Young*, Special Counsel, Montpelier, for Appellee Department of Public Service.

**Dooley, J.** Central Vermont Public Service Corporation (CVPS) appeals from an order of the Vermont Public Service

Board (PSB) that part of the costs of operation of Vermont Power Exchange, Inc. (VPX), the state's purchasing agent for power delivered by small power producers pursuant to the Public Utilities Regulatory Policy Act of 1978 (PURPA), 16 U.S.C. § 824a-3, must be borne by the regulated electric utilities in Vermont. CVPS argues that the order was beyond the power of the PSB, lacks a sufficient jurisdictional finding and is unsupported by the evidence. We affirm.

This case arises from the unique way in which Vermont has implemented PURPA, which was enacted for the purpose of encouraging cogeneration and small power production facilities. See *FERC v. Mississippi*, 456 U.S. 742, 750–51 (1982). PURPA's main requirement, as detailed in regulations adopted by the Federal Energy Regulatory Commission (FERC), is that electric utilities must purchase power from qualifying small power and cogeneration facilities, termed "qualifying facilities," at full avoided cost, defined as "the costs to an electric utility of electric energy . . . which, but for the purchase from the qualifying facility . . ., such utility would generate itself or purchase from another source." See 18 C.F.R. §§ 292.101(b)(6), 292.303(a), 292.304(b)(2); see generally *American Paper Institute v. American Electric Power Service Corp.*, 461 U.S. 402 (1983) (upholding FERC regulations). Although FERC regulations detail this requirement, the main implementation of the federal law is left to the states. See *Consolidated Edison Co. v. Public Service Commission*, 470 U.S. 1075, 1076 (1985) (White and Blackmun, JJ., dissenting from dismissal for want of a substantial federal question); *In re East Georgia Cogeneration Limited Partnership*, 158 Vt. 525, 528, 641 A.2d 799, 801 (1992).

Although the obligation to purchase at avoided cost is imposed on each electric utility, when the Vermont PSB implemented PURPA, it created statewide rates based on the combined avoided costs of all utilities in Vermont. Vermont Public Service Board, Rule No. 4.100, § 4.104(A) (hereinafter PSB Rules). Under the Vermont system, each utility is required to purchase a percentage of the power produced by a qualifying

facility.[1] The percentage is equal to each utility's pro-rata share of the total Vermont retail kilowatt-hour sales for the previous calendar year. *Id.* This system avoids complicated avoided cost calculations for each of Vermont's twenty-three electric utilities. It also avoids imposing the output of a qualifying facility on the one utility in the service area where it is located. This method of selling and distributing PURPA power is possible because the Vermont electric system is integrated through a single transmission entity so that power delivered anywhere in Vermont can be made available to all utilities.

Because no single utility is contracting to purchase power from a qualifying facility, Vermont's PURPA compliance system requires an intermediary to purchase the power, distribute it and pay the producer. Originally, the expectation was that these functions would be assumed by the Public Service Department. The Department declined, however, and the PSB in its rules provided for the designation of one or more purchasing agents to perform these functions. PSB Rules § 4.102(C). From the beginning of the system in 1983, the only purchasing agent has been VPX, a private corporation designated by the PSB to perform this service. As we explained recently in *In re Department of Public Service*:

> The purpose of VPX is to insure proper financial and power accounting so every utility takes on its fair share of the state's PURPA obligation. VPX is not a utility. Its agreements are binding on utilities only to the extent provided by law and PSB regulations. In no sense have the utilities agreed to any actions of VPX. Their obligation to purchase power pursuant to VPX contracts is entirely created by the PURPA laws and associated regulations.

157 Vt. 120, 126, 596 A.2d 1303, 1307 (1991) (citation omitted). The "prices, terms or rates charged by the purchasing agent" are established by order of the PSB. PSB Rules § 4.102(C).

Originally, fees to cover VPX costs were assessed only against producers of PURPA power and those who sought qual-

---

[1] Qualifying facilities with installed capacities of one hundred kilowatts or less can elect to sell solely to the interconnecting electrical utility. PSB Rules § 4.104(B). They are paid, however, based on the avoided costs of the composite electric utility system.

ifying facility status. In 1988, however, the PSB considered a declaratory judgment proceeding questioning the allocation of the costs of VPX, as well as the costs of power accounting functions of Vermont Electric Power Company (VELCO), the state's transmission utility, which distributes power from qualifying facilities. See *Re Vermont Power Exchange, Inc.*, 91 Pub. Util. Rep. 4th 299 (Vt. PSB 1988). The Board found the proof inadequate to impose a particular portion of VPX costs on the electric utilities but added, "[W]e do not agree that the services that VPX provides to the purchasing utilities should continue to go uncompensated . . . . We believe the costs of those services should be shared equitably between producers and utility companies, and are not convinced that this is accomplished under the current arrangement." *Id.* at 304. Based on its conclusion, the Board amended its rules to provide that the "purchasing agent may assess against qualifying facilities and electric utilities, from each group in equal shares, fees in amounts set in accordance with this subsection." *Id.* § 4.104(D). The fees are to be set to "cover its reasonable and necessary expenses of performing its functions under this Rule in accordance with generally accepted utility ratemaking practices." *Id.* The rules set forth a procedure similar to that of a utility rate case for the PSB to set the fees of the purchasing agent.

This proceeding followed from a 1988 request by VPX to raise its fees and levy a fee on utilities. In a lengthy proceeding in which CVPS actively participated, the PSB determined that VPX needed fee revenues of $475,610 to meet its responsibilities as purchasing agent. As in the earlier declaratory judgment proceeding, the PSB decided that it was inappropriate to address the allocation-of-fees question in connection with determining VPX's revenue needs. Because Rule 4.104(D) had already been amended, however, VPX proposed a new rate design that would raise part of its revenues from utilities. The PSB opened a new rate proceeding, which is now the subject of this appeal, on this request. No party appealed the revenue order that was issued on October 10, 1990, and it became final.

The PSB approved the VPX proposal. The fee structure included a fee on utilities based on power delivered to them by qualifying facilities. The structure was calculated by determining total revenue need and subtracting from that revenue

$97,698, which was specifically authorized to be raised by fees against applicants for qualifying facilities status. The fees assessed against applicants, as well as the amount of VPX expenditures not attributable to purchasing agent responsibilities, was determined in the revenue case. The obligation to pay the remainder of $377,912 was split between producers and utilities so that each was required to pay $188,956. The revenues to be raised from utilities was turned into a fee of $.00147 per kilowatt hour of energy delivered through VPX. This figure was based on sales at the time of the order.

The primary position of CVPS is that the Board lacked the authority to require utilities to pay part of the cost of VPX activities. In support of this position, it argues (1) the Legislature has not given the PSB the authority to order utilities to pay VPX costs; (2) even if such authority was intended, it is an improper delegation of legislative power; and (3) PURPA does not authorize collection of VPX costs from utilities. In assessing these arguments, it is important to emphasize what this case is *not* about. CVPS has not attacked the method of PURPA implementation in Vermont: the use of a single, blended, avoided-cost calculation for all utilities; the requirement that every utility purchase a share of the power delivered by a qualifying facility irrespective of where that facility is located; and the use of a purchasing agent to contract for the purchases and handle billing, collection and related services. Indeed, these aspects of Vermont PURPA implementation have been present since 1984, and Vermont utilities have not challenged them, at least in this Court, despite a number of opportunities. Most recently, the utilities settled an attack on the 1986 small-power production rates after argument in this Court and before decision. *In re Green Mountain Power Corp.*, No. 89–194 (settled and discontinued July 2, 1990). Thus, we must assume the validity of the PURPA implementation system and focus only on the allocation of its costs.

There are two possible sources of PSB power for the cost allocation rule. The first is the PURPA statute and applicable FERC regulations. The statute requires FERC to adopt rules and each state regulatory authority to implement such rules with respect to each electric utility for which it has ratemaking authority. 16 U.S.C. §§ 824a-3(a), (f)(1). The FERC rules allow

the state regulatory authority to implement the statute by "issuance of regulations, an undertaking to resolve disputes between qualifying facilities and electric utilities . . . or any other action reasonably designed to implement" the rules. 18 C.F.R. § 292.401(a).

The second is a Vermont statute enacted to give the PSB jurisdiction over PURPA implementation. It provides:

> (a) On due notice, the board shall have jurisdiction to hear, determine, render judgment and make orders and decrees in all matters provided for in the charter or articles of any corporation owning or operating any plant, line or property subject to supervision under this chapter, and shall have like jurisdiction in all matters respecting:
>
> . . . .
>
> (8) The sale to electric companies of electricity generated by facilities:
>
> (A) which produce electric energy solely by the use of biomass, waste, renewable resources, cogeneration or any combination thereof; and
>
> (B) which are owned by a person not primarily engaged in the generation or sale of electric power, excluding power derived from facilities described in subdivision (a)(8)(A) . . .; and
>
> (C) which have a power production capacity which, together with any other facilities located at the same site, is not greater than 80 megawatts.

30 V.S.A. § 209(a)(8).

■■ We agree that, in light of the overall PURPA implementation system, § 209(a)(8) gives the PSB authority for the rule that CVPS challenges. Our conclusion is based, in large part, on the unique needs created by the statewide purchasing system. Generally, PURPA envisions a system where a cogeneration or small-power-production facility sells electricity directly to the utility within the service area containing the facility. See 18 C.F.R. § 292.303(a)(1) (utility must purchase energy and capacity made available "directly to the electric utility"). In such a situation, each party incurs costs in negotiating a contract and in administering the delivery and sale of the power. In Vermont, however, these transaction and administra-

tion costs are largely incurred by VPX, which relieves both the producer and the utilities of costs they would otherwise incur. Thus, it is reasonable that the producers and the purchasing utilities share the responsibility to fund the purchasing agent.

■ The PSB is a body of "'special and statutory powers . . . as to which nothing will be presumed in favor of its jurisdiction.'" *Westover v. Village of Barton Electric Dep't*, 149 Vt. 356, 358, 543 A.2d 698, 699 (1988) (quoting *Trybulski v. Bellows Falls Hydro-Electric Corp.*, 112 Vt. 1, 7, 20 A.2d 117, 120 (1941)). Consequently, the PSB's powers include only express legislative grants of power and "'such incidental powers expressly granted or necessarily implied as are necessary to the full exercise of those granted.'" *Id.* at 358–59, 543 A.2d at 699. Under Vermont's implementation of PURPA, the Legislature's grant of power to the PSB is very broad. It grants jurisdiction "in all matters" respecting the sale of electricity to utilities under PURPA. Assuming, as we must, the existence of the purchasing agency system, it is reasonable to conclude that the Legislature intended that the Board fairly allocate the costs of that system to the entities that benefit from it. Indeed, such an allocation is unavoidable and thus is "necessary" as that term is used in the *Westover* formulation.

■ CVPS's argument is actually an indirect attack on the existence of a purchasing agent, and necessarily, the statewide purchasing system the agent implements. Thus, CVPS argues that if the Legislature intended "to authorize VPX rates having the force and effect of law" it would have specifically stated so, and that only utilities have the authority to assess rates with the force of law. For the reasons stated above, we are unwilling to allow CVPS to broaden its argument to cover the whole PURPA implementation system, especially because it is doing so only indirectly. Thus, these attacks misperceive the narrow question properly before us. VPX fees are not utility rates; they are the necessary costs of PURPA implementation in the statewide system. Nor must the Legislature specifically authorize the allocation of any particular cost. As noted below, the Legislature's authorizations are broad, leaving the PSB to determine the detailed regulation necessary.

■■ CVPS also claims that the imposition of VPX fees on the electric utilities is prohibited by FERC regulations because

the utilities will pay more than avoided cost for the power from qualifying facilities. Of course, the states are free to go further than the minimum requirements of PURPA in encouraging co-generation and small-power production. See *In re Vicon Recovery Systems,* 153 Vt. 539, 545–47, 572 A.2d 1355, 1358–59 (1990); *Consolidated Edison Co. v. Public Service Commission,* 63 N.Y.2d 424, 436–37, 472 N.E.2d 981, 986–87, 483 N.Y.S.2d 153, 159 (1984), *appeal dismissed* 470 U.S. 1075 (1985) (state-required rates can exceed avoided cost). In any event, we do not believe that the imposition of part of the VPX fees on purchasing utilities is inconsistent with FERC regulations. The regulations authorize the PSB to take "any other action reasonably designed to implement" the regulations governing arrangements between electric utilities and qualifying facilities. 18 C.F.R. § 292.401(a). They also give the PSB discretion in determining whether to impose interconnection costs on qualifying facilities. *Id.* § 292.306(a). As discussed above, the VPX fees in this case are based on costs that utilities would incur if they dealt directly with cogenerators and small power producers. These administrative and transactional costs are not included in the definition of avoided costs and would be incurred even if utilities purchased power from sources other than qualifying facilities. See *id.* § 292.101(b)(6). Imposing part of these costs on electric utilities, upon whom the costs would usually fall, is an action "reasonably designed" to implement PURPA and does not result in above avoided-cost rates.

■■  Next, CVPS argues that if the imposition of VPX fees on electric utilities is authorized by 30 V.S.A. § 209(a)(8), the statute represents an invalid delegation of legislative functions. The Legislature may delegate power to an administrative agency provided the delegation is not "unrestrained and arbitrary." *State v. Auclair,* 110 Vt. 147, 163, 4 A.2d 107, 114 (1939). Therefore, the Legislature must provide a "sufficient standard or policy to guide the Agency's action." *Rogers v. Watson,* 156 Vt. 483, 493, 594 A.2d 409, 415 (1991).

■  The Board's decision regarding VPX fees was guided by the standards set forth in PURPA. PURPA requires that purchase rates of the output of qualifying facilities be "just and reasonable to the electric consumers of the electric utility and

in the public interest." 16 U.S.C. § 824a-3(b)(1). In addition, the Board may "not discriminate against qualifying cogenerators or qualifying small power producers" when setting these rates. *Id.* § 824a-3(b)(2). There are sufficient standards and policies to guide the PSB in allocating VPX costs between utilities and qualifying facilities.

Further, as Chief Justice Barney explained in *In re Green Mountain Power Corp.*:

> The statutory basis of the Board's regulatory authority is extremely broad and unconfining with respect to means and methods available to that body to achieve the stated goal of adequate service at just and reasonable rates. 30 V.S.A. § 218 authorizes the Board to set rates, tolls, charges or schedules or to change regulations, measurements, practices or acts of the utility relating to its service in order to insure those reasonable rates and adequate service. The choices the Board makes in this area are subject to great deference in this Court so long as it can be shown they are directed at proper regulatory objectives.

142 Vt. 373, 380, 455 A.2d 823, 825 (1983) (citations omitted). Because the Board's approval of the VPX fees will affect rates charged by the electric utilities, we must accord great deference to the Board's choice. See also 30 V.S.A. § 209 (general scope of PSB jurisdiction).

██ Next, CVPS argues that the Board failed to state the source of its jurisdiction to impose VPX fees on utilities, and therefore its order is invalid. Assuming a statement of jurisdiction is required, the argument is groundless in this case. The Board's order is explicitly based on Rule 4.100 which in turn is based on 30 V.S.A. § 209(a)(8) and PURPA. PSB Rules § 4.101. When CVPS made this argument in support of a request to the PSB for a stay, the Board reiterated that it acted pursuant to 30 V.S.A. § 209(a)(8).

CVPS also contends that the Board's order violates Rule 4.100 because it adopts an improper rate design and is not supported by the evidence. This argument arises from the method VPX proposed, and the Board accepted, to raise the revenues needed from the electric utilities. The method chosen was an assessment of $0.00147 per kilowatt hour of power purchased

from qualifying facilities. The Board rejected the alternative method proposed by the utilities—a per-utility fixed fee. CVPS objects to two aspects of the Board-approved fee: (1) it allows VPX more revenues as more qualifying facilities come on line, and (2) the fees vary in relation to the power sold and not the work done by VPX.

To evaluate these arguments, we need to first establish a standard of review. Orders of the PSB are presumed valid. *In re East Georgia Cogeneration Limited Partnership*, 158 Vt. at 531, 614 A.2d at 803. In reviewing these orders, we give great deference to the particular expertise and informed judgment of the Board. *Id.* Findings of fact must be upheld unless clearly erroneous. 30 V.S.A. § 11(b).

The Board called this part of its decision a rate design. This was not technically accurate because, as CVPS consistently points out, VPX is not a utility and this decision will determine the costs CVPS must assume if new qualifying facilities come on line. Our standard of review is based, however, on the nature of the Board's expertise and the appropriateness of paying deference to it. The expertise needed to fairly allocate costs between qualifying facilities and utilities is exactly that which the Board uses to establish a rate design. See PSB Rule 4.104(D) (purchasing agent fees must be determined "in accordance with generally accepted utility ratemaking practices"). We must give deference to the "expert and informed judgment of the Board." *In re Green Mountain Power Corp.*, 131 Vt. 284, 303, 305 A.2d 571, 583 (1973).

The Board was required in this case to choose between imperfect rate design alternatives. The utility proposal allowed no increased revenue for increased work, a situation the Board found ironic because electric utility rates allow increased revenues when power demand exceeds estimates. Thus, CVPS was arguing for a rate structure that it would be unwilling to impose on itself. On the other hand, although there was evidence to support a usage-based rate structure for utilities as related to the costs to VPX of discharging its responsibilities as purchasing agent, the Board concluded that some of VPX's costs were fixed so that they did not vary based on the amount of energy sold. It adopted the VPX proposal on an interim basis subject to

further examination if new qualifying facilities achieved commercial operation.[2] We conclude that the Board's acceptance of the VPX proposal was reasonable. The Board's findings are not clearly erroneous and support the order. We affirm it in light of the deference we give to the Board in this area.

Finally, CVPS argues that the PSB committed error in limiting its discovery in preparation for the hearing. CVPS and other utilities sought voluminous data from VPX bearing on whether its expenses were related to activities required by its role as purchasing agent under Rule 4.100 and the extent to which the fees charged applicants covered the costs for these services. VPX objected, arguing that these issues had been fully resolved in the revenue case and could not be reopened in determining the proper rate structure. The hearing officer agreed that the discovery requests represented a collateral attack on the revenue order and denied the discovery. The Board denied interlocutory review and later reaffirmed the hearing officer's ruling in response to CVPS's stay request.

▮▮▮ The discovery ruling was discretionary, and we will find error only if "such discretion was abused or entirely withheld." *Poplaski v. Lamphere*, 152 Vt. 251, 255, 565 A.2d 1326, 1329 (1989). The needs of VPX attributable to its purchasing agent responsibilities were fully litigated in the revenue case which concluded on October 11, 1990. Also litigated were the costs attributable to applicants for qualifying facility status and

---

[2] CVPS's specific concern was that two large qualifying facilities were coming on-line in the near future and the application of the per-kilowatt-hour utility fee to their output would greatly increase VPX revenues above its need. One of these facilities, a 29-megawatt gas turbine generation facility to be developed by the East Georgia Cogeneration Limited Partnership, was denied a certificate of public good by the PSB, and the decision was recently affirmed by this Court. *In re East Georgia Cogeneration Limited Partnership*, 158 Vt. at 539, 614 A.2d at 807. The second was a small-power facility to be operated by Ryegate Wood Energy Corporation in Ryegate, Vermont. That facility has been continuously delayed, and, as a result, it lost the availability of a favorable avoided-cost rate in a Board decision that was affirmed by this Court in *In re Dep't of Public Service*, 157 Vt. at 127–28, 596 A.2d at 1306–07. We have no information in this record to show whether the plant will be built even though the rate available to the developer was reduced. It is fair to say, however, that the risk of greatly excessive revenues has been greatly reduced since the Board action in this case.

facilities waiting to come on line. CVPS participated fully in that proceeding because it faced the VPX request to impose part of these costs on utilities. The amendment to PSB Rule 4.100 requiring the utilities to bear part of VPX costs became effective January 8, 1990. Thus, CVPS was aware at the end of the VPX revenue case that it eventually would be required to pay some of VPX's costs. It did not appeal, however, the cost determinations and allocations arrived at in the revenue case. We agree with the Board that CVPS was precluded by collateral estoppel from relitigating the issues that had been resolved in the revenue case. See *Berlin Convalescent Center, Inc. v. Stoneman*, 159 Vt. 53, 60, 615 A.2d 141, 145 (1992). CVPS had a full and fair opportunity to litigate these issues in the revenue case, and applying issue preclusion in this case is appropriate. See *id.*

*Affirmed.*